IN RE ESTATE OF D. L. ONSTOT.

JOHN A. CASS et al., Appellees, v. JOHN F. ONSTOT et al., Appellants.

No. 44114.

FEBRUARY 8, 1938.

Grant L. Hayes, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellants.

Frank F. Wilson, for appellees.

SAGER, J.—This case has its foundation upon an antenuptial contract which will hereafter appear.

This is a proceeding in probate and will be considered and determined so far as may be within the rules of practice applicable to that court. No motion to transfer the cause to the equitable calendar, where perhaps it might properly have been heard, was made, and we are not under the necessity of examining with any strictness the sufficiency of the statements of appellees' claim as might be done in law or equity pleadings under our statute. Appellants' counsel cite many authorities, all of which have been examined and their general purport found to be that an order of settlement of an estate has the effect of a final adjudication unless assailed by one of the methods provided by our practice. This unless the settlement shall have been the result of fraud or mistake. With this thought in mind appellants urge that appellees should have asserted whatever rights they

may have had in the estate of Amelia Onstot, instead of filing a claim as they have done against the estate of her deceased husband.

■■■ Complaint is made by appellants of the various rulings of the court striking proposed amendments to their answer, but we find it unnecessary to enter into a discussion of such rulings now. Even though the claim filed by appellees is not a model of pleading, we are disposed to examine it in the light of the rule announced in In re Estate of Newson, 206 Iowa 514, at p. 523, 219 N. W. 305, 309 :

"Technical accuracy and fullness of allegation or that degree of particularity of pleading and conformity of pleading to proof required in ordinary actions are not to be expected, and are not required, of claims filed against estates."

We might say of this case as was said by Weaver, J., in In re Estate of Guthrie, 183 Iowa 851, at p. 852, 167 N. W. 604 :

"The proceedings are somewhat out of the ordinary, but the court seems to have had jurisdiction of the parties and of the property in question, and there is no apparent reason for not disposing of the case on its merits."

With these preliminaries disposed of we direct our attention to the merits of the case itself.

D. L. Onstot, a man of rather advanced years, married Amelia Cass in 1923. Before the marriage was consummated the parties entered into a written contract in the Province of Quebec in Canada, which, so far as it needs attention here, reads as follows:

"That whereas the above parties are figuring on getting married, and, whereas, a condition of said intention is, that each shall retain the property, both real and personal, that each possessed prior to marriage. That the contract in marriage so far as property is concerned, shall be subject to these agreements. It is agreed that in case of the death of D. L. Onstot, party of the first part, before the death of Miss Amillia Cass, party of the second part, that all property, both personal and real, which D. L. Onstot possesses shall pass to his now legal heirs, or such of them as he shall designate, just the same as if he had not married Miss Amillia Cass. Except that second party, Miss Amillia Cass

shall have a life lease on forty acres designated as northeast quarter of the northeast quarter of section three, township sixty-nine, Range Twenty-Eight, Ringgold County, Iowa. This life lease to continue as long as second party shall remain the widow of D. L. Onstot, but in case of her getting married again, this life lease will, by virtue of said marriage, become null and void. In case of death of second party before the death of first party, it is agreed that the heirs of second party shall have no claim of the property of D. L. Onstot, either real or personal. The contract in marriage which is contemplated shall not bar first party from transferring his property during the marriage, except the forty acres reserved for life lease.

"It is the intent of this contract that the property of each shall remain separate and distinct, except the life lease on the forty acres subject to the stipulation mentioned."

Following the execution of this contract, and the marriage, the parties moved to Ringgold county in this state, where they lived together as husband and wife until October 24, 1930, when Amelia died, leaving surviving her husband and certain collateral relatives, only two of whom, John A. Cass and Johial Cass, brothers, are interested in this controversy. Other collateral heirs at one time were parties, but withdrew and their interests are not involved here.

It appears from the record that D. L. Onstot was a man owning considerable real estate, and one of the demands made by the brothers of Amelia is that certain real estate conveyed by Onstot should be subjected to the claim they are here making. The trial court contented itself with allowing their claims, making no order on this part of appellees' prayer. No appeal was taken by appellees from the failure on the part of the court in this respect.

Five days after the death of Amelia, her husband D. L. Onstot made application that he be appointed executor, alleging among other formal statements that Amelia:

"* * * left her surviving the following next of kin, each of whom has a right to a grant of administration upon the estate of said deceased, which is, by law, superior or equal to that of the appointee .. herein after proposed:

"(Name) J. Hoyle Cass, (Age) legal, (Affinity) brother, (Post Office) Lachute, Canada.

" (Name) John Cass, (Age) legal, (Affinity) brother, (Post Office) Julesburg, Colo."

Following the appointment of this executor he proceeded to administer the estate, and at the conclusion thereof filed a final report, giving no notice to anyone, and appropriating to himself the avails of certain Canadian bonds, with interest, and had the estate closed. Aside from the reference in the petition for the appointment of the executor no mention is made of any collateral heirs and none had an opportunity to object to the final report, or otherwise assert his or her interest in the estate. The executors seek to justify this appropriation on grounds which will hereafter be stated.

When the collateral heirs of Amelia discovered the situation they filed the claim which is being here considered, alleging among other things that:

" * * * the said D. L. Onstot, deceased, in violation of the terms and provisions of the said pre-nuptial contract, sold, assigned, and transferred the said bonds for their then actual cash value, which was $2,831.28, and he then and there received said sum of money for the said bonds, and he then wrongfully and fraudulently and illegally converted the said sum of money to his own use and benefit, and has never accounted for said sum of money to these plaintiffs, who were rightfully and legally entitled thereto, and thereby the said D. L. Onstot, deceased, defrauded these plaintiffs for the full value of said bonds."

Further, as a part of the claim, they allege that:

" * * * D. L. Onstot * * * obtained an order of this Court approving the same (final report), but said order was made without jurisdiction of the Court to hear said report or to make any order, for the reason that the same was a fraud on the Court, and these plaintiffs for each and all of the reasons stated herein, and for the further reason, that no notice of any kind or character was ever made or given to any one of the filing of the said report or of the time and place of hearing thereon * * *."

If it be said that these allegations do not constitute good pleading within strict rules, they nevertheless call the attention of the court and of appellants to the matter involved, and the case was submitted and argued largely upon the question what was the proper construction of the antenuptial contract.

After the various amendments proposed by the executors had been stricken the cause stood on a general denial. The executors seek to justify the appropriation by their testator to his own use of all the estate of Amelia on the ground that the contract provided no more than was fixed by the statutes of inheritance of the state, and that as a consequence, there being no issue, he was entitled to it all because it did not amount to $7500. It should be noted that Amelia never had any children, nor adopted any, and her only heirs were the collateral ones already mentioned.

The record is barren of many incidents which might have been shown in the condition and circumstances of the parties, but we regard such evidence as unimportant because the contract itself, as we see it, determines the issues. No attempt will be made to analyze the many cases that may be found laying down rules of construction applicable thereto. Our own views have been adequately expressed by Hamilton, J., in In re Estate of Shepherd, 220 Iowa 12, at page 19, 261 N. W. 35, 39, from which we quote:

██ ▌ "We have held that an antenuptial contract is in the same category as other contracts, and is construed by the same rules as other contracts, and, if fair on its face and free from fraud, it is as legal and enforceable as other contracts. [Citing cases.] As said in Cummings v. Wood, supra [197 Iowa 1356, 1358, 199 N. W. 369, 370]:

" 'Its primary purpose is to make a property settlement before marriage between the parties, whereby their rights respectively are determined independently of the marital statute, and which would otherwise obtain. In construing such a contract, the intention of the parties is the thing indispensable to be discovered, and in searching for the intent, an antenuptial contract, like a will, is to be taken by its four corners. * * * The intention of the parties must be determined from the language of the instrument itself, the circumstances and conditions of the contracting parties, the property existent at the time of entering into the contract, and other matters which would constitute the inducement or reason for the making of the antenuptial agreement. In re Estate of Hubinger v. Weismann, 150 Iowa 307, 130 N. W. 155. * * * Agreements of this character are looked upon by the courts with favor, and are liberally inter-

preted to carry out the intentions of the parties thereto. * * *
The very purpose in the execution of such a contract is to fix
and determine the interest that the parties have respectively in
the property of the other.'

"Antenuptial contracts of this character are valid, binding,
and enforceable, and are based upon the consideration of mar-
riage, which is looked upon by the courts as of the very highest
known to the law."

All the courts whose expressions we have encountered in
this connection indicate that a liberal construction will be
adopted to carry out the intention of the parties.

The general rule is summed up in 30 Corpus Juris, Title,
Husband and Wife, sec. 211, page 648, as follows:

"Intention of Parties. Liberal construction will be given
to marriage settlements in order to carry out the intention of the
parties. The court will not be bound by technical rules and
where necessary to carry out the presumed intent of the parties
will use greater liberality of construction than in the case of
wills or deeds. The intention is not to be conjectured, but is to
be collected from the nature of the agreement, the language and
context, and the usage in similar cases. It is to be noted, how-
ever, that in construing an antenuptial contract regard must be
paid not only to the parties' language but also to what the law
implies therefrom in view of their mutual promises to marry.
Manifest intention will prevail over doubts which might be
raised by strict grammatical construction."

■■■ With these principles in mind, we turn to an examina-
tion of the contract itself. Its terms are plain and no elabora-
tion or argument would make them plainer. Appellants' con-
tention that the contract had no effect whatever and left D. L.
Onstot in the same position as if no such contract had ever been
made, except for the provision with reference to a life estate in
40 acres, seems to be without reasonable support. Their con-
struction would require a finding that Onstot traveled to Can-
ada in his old age to marry a woman who was somewhat ad-
vanced in years (though we do not recall that her exact age is
given), taking with him, as has been suggested in oral argument,
a written antenuptial contract, or having it prepared when he
got to Canada, and that he had no intention of accomplishing

more than would have resulted without any such contract; or it would require the construction that he had knowledge that his prospective wife was retaining nothing for herself or her heirs except a life estate in 40 acres, while signing away all the interest in her husband's estate which would have been hers but for the contract.

We cannot believe that any such result was intended, or that any such construction can be fairly made, taking the instrument by its four corners. We hold that the court was right in awarding to the two claimants-appellees their one-sixth interest in the proceeds of these bonds, and that its judgment and order in this regard should be, and it is, affirmed.—Affirmed.

MITCHELL, KINTZINGER, DONEGAN, HAMILTON, ANDERSON, and MILLER, JJ., concur.

RICHARDS, J., dissents.