**In re the Marriage of Arthur M. APPLEGATE and Rhené Applegate.**

**Upon the Petition of**

**Arthur M. Applegate, Petitioner–Appellee,**

**And Concerning**

**Rhené Applegate, Respondent–Appellant.**

**No. 95–1050.**

Court of Appeals of Iowa.

May 29, 1997.

Tom Hyland and Gregory D. Brandt of Hyland, Laden & Pearson, P.C., Des Moines, for Respondent–Appellant.

Stacey Bell and Steven H. Shindler of Smith, Schneider, Stiles, Hudson, Serengeli, Mallaney, Shindler & Scalise, Des Moines; and David A. Johnson of Johnson & Lane, Knoxville, for Petitioner–Appellee.

Heard by HABHAB, C.J., and SACKETT and CADY, JJ.

HABHAB, Chief Judge.

Arthur (Art) and Rhené Applegate were married on April 4, 1987, in Fort Lauderdale, Florida. Rhené has two children from a prior marriage who lived with the parties throughout the marriage. Art and Rhené signed a prenuptial agreement providing for joint/mutual ownership of the parties' property after five years, with expressed exceptions. Part of that agreement was Rhené would be entitled to equal ownership of all Cayman Islands assets after the parties had been married for five years.

Art has a degree in civil engineering and worked several years for Best Steel as a sales engineer. He had started his own business, Applegate, Inc., in 1979 and was the sole stockholder. After leaving Best Steel in 1983, Art was subject to the terms of a no-compete agreement and was unable to work in the State of Florida for two years. At that time, Applegate, Inc. became his sole source of income. Applegate, Inc. is a corporation with the stated purpose of designing, supplying, and constructing steel buildings. In 1981, Art became involved with a corporation in the Cayman Islands known as Caribbean Structures, Ltd. (CSL). Through CSL, Applegate, Inc. is able to do business in the Caribbean.

Rhené has worked as a cosmetologist. However, when the couple's net worth reached $1.5 million in 1991, Rhené quit working outside the home as previously agreed by the couple. Rhené is currently unemployed and has expressed a desire to attend a two-year business school. She is owed back child support by the children's father in excess of $19,200.

In July 1992, the Applegates bought a home in Knoxville, Iowa. Rhené and her two children moved there and Art was to join them. However, the marriage began to disintegrate and the couple separated in October 1992. Art filed a petition for dissolution of the marriage in January 1994.

After trial, the district court rejected Art's contention he owned no more than a ten percent contingent interest in CSL. However, the court concluded the identity and value of Art's interest in the Cayman Islands assets could not be determined. The court found Rhené is entitled to fifty percent of whatever Art's interest is in those assets. The court then set aside property excluded from distribution under the prenuptial agreement and awarded Rhené about fifty percent of the couple's remaining United States assets. In addition to the property awarded Rhené, the court ordered Art to pay her a cash sum of $183,725. The court did not award Rhené alimony. It also found any unpaid temporary support was part of the property distributed. It denied Rhené's con-

tempt application. The court also found marital property had been used to pay attorney fees for Art in the amount of $19,500 and for Rhené in the amount of $3000. The court refused to award additional attorney fees in the decree.

Rhené appeals. She contends she is unable to benefit from the ownership interests granted to her by the district court.

■ As this is an equity action, our review is de novo. Iowa R.App.P. 4. We give weight to the findings of fact made by the trial court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R.App.P. 14(f)(7). We have a duty to examine the evidence anew, disconnected, ultimately, from the trial court's findings. *See In re Marriage of Siglin,* 555 N.W.2d 846, 849 (Iowa App.1996). In our de novo review of the record, we affirm the decision of the district court.

*I. Property.* Iowa Code section 598.21(1) expressly permits the court to consider the provisions of a prenuptial agreement when deciding equitable property division issues. *In re Marriage of Spiegel,* 553 N.W.2d 309, 313 (Iowa 1996). Iowa case law has long held prenuptial agreements are favored in the law. *Id.* (citations omitted). The purpose of such agreements is to "fix and determine the interest that the parties have respectively in the property of the other." *Id.* (citing *In re Estate of Onstot,* 224 Iowa 520, 526, 277 N.W. 563, 566–67 (1938)).

■ When parties enter into a prenuptial agreement in the absence of fraud, mistake, or undue influence, the contract is binding. *Id.* Although validity of the prenuptial agreement is not disputed by either party, Rhené requests that in light of the court's inability to enforce her award of property located in the British West Indies, we award her various items of property specifically set aside to Art in the prenuptial agreement. We decline her request.

The prenuptial agreement entered into by the parties provided all assets, except those specifically excluded, would become mutual assets of both parties during a five-year period at the rate of twenty percent per year, or in five years both parties would be totally vested in all but the excluded property of the other. The agreement excluded cottages belonging to Art's family, and his IRA, pension fund, and retirement plan. The agreement specifically included the Cayman Island assets.

There is testimony in the record that reflects CSL has a value of $1,246,830.90 and that it primarily purchases steel buildings from Applegate, Inc. and sells them to third parties. The record reveals all Applegate, Inc. products are "pre-sold;" in other words, CSL has a purchaser for each building before it is ordered from Applegate, Inc. No other person or company supplies steel structures or designs for CSL other than Applegate, Inc. The record also reveals the Cayman Islands are purportedly a "tax haven" for United States business persons.

We agree with the trial court that Art is an equitable and beneficial owner of CSL substantially beyond the ten percent interest he claims to own. The record reveals Applegate, Inc. could not conduct business in the Cayman Islands as it is not a Caymanian company. Caymanian law apparently requires that a business such as CSL have no less than sixty percent local ownership. There is testimony that Malcolm Stephenson may own sixty percent of the company; Francia Lloyd may own forty percent. Stephenson and Lloyd are both Caymanian. When questioned why he was not an owner of CSL, Art simply responded, "Well, I wasn't Caymanian. I just wasn't."

Art claims he has been involved in the company only to protect his ten percent contingent interest in any assets CSL has upon liquidation. He estimated the value of this interest to be $125,000. However, he personally guaranteed an investment of CSL in a venture known as Cayman Business Park in the amount of $900,000.

In our de novo review of the record, we have found numerous facts which support the trial court's reasoning as to Art's interest in CSL. In 1988, Art undertook authority to write checks on behalf of CSL on its accounts and did all of its billing. Art has commingled personal marital funds in a CSL account. Furthermore, although Malcolm Stephenson

and Francia Lloyd purportedly own CSL, it appears neither has ever been paid any money or benefits from the company.

A memo from Art to Trevor Lloyd (husband to Francia Lloyd) and Cayman Business Park partners reflects that Art offset money owed by Cayman Business Park to CSL by having Cayman Business Park partners issue stock to CSL. Additionally, in correspondence of June 1990, Art wrote to a potential investor in Cayman Business Park stock:

· This letter must put to bed any and all questions/misunderstandings regarding the sale of outstanding shares of Cayman Business Park stock.

When Trevor Lloyd and I first conceived this project over three years ago, we envisioned a scenario whereby he and ·I would be the sole owners of all Cayman Business Park stock.

. . . .

At this time I have purchased four additional shares at U.S. $10,000.00 each and am prepared to purchase more as necessary.

. . . .

At this time the best offer we can make is to sell you up to four additional shares at U.S. $10,000.00 each. This is the consensus which was reached by all concerned. With acceptance of this offer, we would expect you to assist Trevor Lloyd and myself in supervising/ coordinating the construction process through to the completion.

Art contends these offerings were made in his role as agent for CSL. We find his contention is not supported by the evidence. Although it is Art's contention CSL is the owner of Cayman Business Park, nowhere in this document is the involvement of CSL or Malcolm Stephenson mentioned. Additionally, Art has listed Cayman Business Park as an asset and derived the total of his annual income from calculations of both Cayman Island and Fort Lauderdale assets. The record also reflects Art made a formal offering of stock in Cayman Business Park to another person in April 1990.

In a "letter of wishes" dated June 8, 1989, Art stated the following with regard to the Cayman Island property:

This letter is written for the purpose of defining how I wish to have the assets of Caribbean Structures Ltd. (CSL) distributed in the event of my death or incapacitation.

. . . .

As your fee for this service, I give you five percent of the value of the assets controlled by CSL in the Cayman Islands. As for the balance of the assets, I wish you to liquidate any and all of the non-cash assets for the purpose of turning same into cash.

. . . .

For the purpose of this letter, my estate in the Cayman Islands would include any and all assets controlled by CSL but would exclude all assets owned by myself.

On November 18, 1992, after the parties had separated, Art executed a second "letter of wishes" which completely excluded Rhené. Another letter directed to Art from Malcolm Stephenson, drafted after the separation, indicated Art's interest in CSL was merely a ten percent interest in any assets owned by CSL upon liquidation. Art contends these "letters of wishes" merely refer to his ten percent contingent interest in CSL. We reject this contention. Nowhere in these documents does Art indicate the property to be conveyed is merely a contingent interest in CSL.

Rhené takes the position the situs of the Cayman Island property and its assets are beyond the jurisdiction of the Iowa courts. Thus, she argues the district court's grant of fifty percent of Art's interest in the Cayman Island assets is meaningless. As noted previously, we decline her request that certain properties specifically excluded by the prenuptial agreement be awarded to her in lieu of that fifty percent interest.

It cannot go unnoticed that if, indeed, an unenforceable circumstance exists by virtue of the trial court's decree, that same circumstance existed at the time of the signing of the prenuptial agreement. What we are, in effect, being asked to do is rewrite the pre-

nuptial agreement by awarding Rhené property in lieu of that fifty percent interest. To oblige her request would minimize to a great extent the purpose of prenuptial agreements. In our de novo review of the record, we affirm the property award made by the district court.

 **II. Alimony.** Alimony is a stipend to a spouse in lieu of the other spouse's legal obligation for support. *In re Marriage of Miller*, 532 N.W.2d 160, 162 (Iowa App. 1995). "The discretionary award of alimony is made after considering those factors listed in Iowa Code section 598.21(3)." *In re Marriage of Stark*, 542 N.W.2d 260, 263 (Iowa App.1995); *see In re Marriage of Hayne*, 334 N.W.2d 347, 350 (Iowa App.1983). The distribution of property is a factor we are to consider. Iowa Code § 598.21(3)(c) (1995). The ability of one spouse to pay alimony must be balanced against the needs of the other spouse. *Stark*, 542 N.W.2d at 262. Alimony is not an absolute right; an award depends upon the circumstances of each particular case. *Miller*, 532 N.W.2d at 162.

In our de novo review of the record, we affirm the district court's denial of alimony. We have considered the remaining contentions raised by the parties and reject them as they are without merit.

**III. Attorney Fees.** Rhené argues the trial court erred in failing to award her additional attorney fees. Art was ordered by the district court to pay $3000 in temporary attorney fees. Rhené incurred trial attorney fees totaling $22,665.93. She requests an award of an additional $15,000 in trial attorney fees. She also requests we award her appellate attorney fees. We deny her requests.

 *a) Trial Attorney Fees.* An award of attorney fees lies within the discretion of the trial court. *In re Marriage of Guyer*, 522 N.W.2d 818, 821 (Iowa 1994). Whether attorney fees should be awarded depends on the respective abilities of the parties to pay the fees and the fees must be fair and reasonable. *Id.* To overturn the decision of the trial court, Rhené must establish the trial court abused its discretion. *Id.*

Under the circumstances present in this case, we affirm the award of trial attorney fees to Rhené without modification.

 *b) Appellate Attorney Fees.* An award of appellate attorney fees is not a matter of right but rests within our discretion. *In re Marriage of Scheppele*, 524 N.W.2d 678, 680 (Iowa App.1994). In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal. *Id.* Given the circumstances present in this action, we find equity does not warrant an award of appellate attorney fees to Rhené.

**AFFIRMED.**

HUITINK, STREIT and VOGEL, JJ., take no part.