**IN THE COURT OF APPEALS OF IOWA**
No. 14-0920
Filed April 22, 2015

**IN RE THE MARRIAGE OF MARY K. BOLAND-CHAMBERS
AND RYAN P. CHAMBERS**

**Upon the Petition of
MARY K. BOLAND-CHAMBERS, n.k.a MARY K. BOLAND,**
       Petitioner-Appellee,

**And Concerning
RYAN P. CHAMBERS,**
       Respondent-Appellant.
_____

       Appeal from the Iowa District Court for Linn County, Sean W. McPartland,

Judge.


       A husband appeals the district court's refusal to add language to a QDRO

to protect his interest in his former wife's IPERS pension and the court's decision

to set aside gifts, inheritance, and premarital property to his wife.  **AFFIRMED AS**

**MODIFIED.**


       Karen A. Volz of Ackley, Kopecky & Kingery, Cedar Rapids, for appellant.

       Kodi A. Brotherson of Babich Goldman, P.C., Des Moines, for appellee.


       Heard by Vogel, P.J., McDonald, J., and Scott, S.J.*

       *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**VOGEL, P.J.**

Ryan Chambers appeals the district court's ruling in this dissolution proceeding, asserting the district court should have ordered certain provisions be included in the qualified domestic relations order (QDRO) that would protect his interest in his former wife, Mary Boland-Chambers's, IPERS pension. Alternatively, he asks that we value the IPERS at its refund value as of the date of trial and order Mary to make a property equalization payment to account for the disparate award. He also claims the court should not have set aside premarital, gifted, and inherited funds Mary received before and during the marriage. In addition both parties request an award of appellate attorney fees. Because we conclude the IPERS account should be valued at its refund value and included in the property distribution with an equalization payment made to Ryan, we modify the dissolution decree; however, we affirm the remainder of the decree.

## I. Background Facts and Proceedings.

Ryan and Mary were married in 1998, and two children were born of the union. Mary filed a dissolution proceeding in 2012, and the case proceeded to trial in December 2013. In the dissolution decree entered in March 2014, the court decided issues of child custody, physical care, child support, and property division; however, only the property division issues related to the parties' retirement accounts and funds set aside to Mary have been raised on appeal.

## II. Scope and Standard of Review.

We review dissolution actions de novo as they are heard in equity. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "[W]e examine the

entire record and adjudicate anew the issue of the property distribution." *Id.* While we give weight to the findings of the district court, particularly concerning the credibility of witnesses, we are not bound by those findings. *Id.* However, "[w]e will disturb the district court's ruling only when there has been a failure to do equity." *Id.* (quotation marks and citations omitted).

## III. QDRO Language.

Ryan appeals the district court's rulings that rejected his request for certain language to be included in the QDRO that will be filed in relation to Mary's IPERS account. He is requesting language to (1) name him as Mary's "contingent annuitant" in order for him to receive a 50% joint and survivor death benefit, (2) name him as a beneficiary with respect to the pre-retirement death benefits where he would receive the same percentage of death benefits as he would receive upon Mary's retirement, (3) restrict Mary from requesting a refund from the IPERS account without his consent, and (4) provide him a share of any benefit increase afforded to Mary such as cost of living increases, dividends, or any other postretirement increase in the same proportion as he would receive upon Mary's retirement. Ryan claims without these provisions, his court ordered interest in Mary's IPERS account is speculative, totally dependent on Mary's future actions. He claims without these provisions, if Mary dies before retirement, he would receive nothing; Mary could request the refund value of her account prior to retirement, leaving him with nothing; Mary could elect a retirement option where the benefits would cease upon Mary's death; Mary could select a survivor annuitant who would receive his share upon Mary's death; and he would not receive his share of increases that occur over the life of the

pension. In the alternative, he requests we value the IPERS account at its refund value and order Mary to make a property equalization payment to account for the disparate award.

Mary first asserts the district court correctly refused to require the additional language in the QDRO because Ryan failed to make this request at trial or offer any evidence in support of his request. She points out that Ryan requested the court use the refund value of the IPERS account, where she asked the court to divide the account under "the percentage method of division" which uses the formula articulated in *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996).[1] Mary claims Ryan did not introduce any evidence to support his request until after the district court ruled on the posttrial motions.

In reviewing the record in this case, we note in the Joint Pretrial Statement, Mary proposed each party be awarded their own retirement accounts free and clear of any claim by the other party, whereas Ryan asked that the accounts be valued as of the date of trial and Mary be ordered to pay him an equalization payment in light of the fact that the value of her retirement accounts significantly exceeded the value of his. However, at trial, Mary changed position

---

[1] The *Benson* court articulated a formula to be applied to defined-benefit pension plans in order to divide the retirement account upon the dissolution of a marriage. The formula is computed as follows:

> A fraction is first computed, the numerator being the number of years during the marriage [benefits accrued] under the pension plan . . . and the denominator being the total number of years . . . benefits accrued prior to maturity (i.e., receipt of payments upon retirement). This fraction represents the percentage of [the] pension attributable to the parties' joint marital efforts. This figure is then multiplied by [the spouse's] share of the marital assets (fifty percent). Finally this second figure is multiplied by [the] total accrued monthly benefit upon maturity (retirement) to calculate [the spouse's] share.

*Benson*, 545 N.W.2d at 255. This has come to be known as the *Benson* formula.

and requested her IPERS account be divided based on the *Benson* formula. She also reiterated the request in her posttrial brief. As a result of this change in position, Ryan, in his posttrial brief, agreed the IPERS account should be divided using the *Benson* formula but also asserted specific language should be added to the QDRO to protect his right to receive future benefits.

The district court ordered the IPERS account be divided using the *Benson* formula, providing Ryan a 50% share[2] of the marital portion of the account and ordering Mary's counsel to draft the QDRO. The court specifically rejected Ryan's request that Mary be required to name him as a "contingent annuitant" of postretirement death benefits, finding instead Mary should be free to name the children or others as the beneficiaries, "particularly since Mary presumably will continue to accrue IPERS benefits after the dissolution and prior to her retirement." The court did not address the other language Ryan requested be included in the QDRO.

Both Ryan and Mary filed posttrial motions under Iowa Rule of Civil Procedure 1.904(2). Ryan again requested the court order the proposed language be included in the QDRO. In response, Mary provided the court with a copy of the QDRO that her attorney had prepared and conceded she would be willing to include a provision restricting her from requesting a refund from the account without Ryan's consent. However, she objected to the other provisions Ryan had requested be included in the QDRO and also attached a document

---

[2] Mary had argued Ryan should only receive a 25% share of the martial portion of the account. However, Mary started her employment with the State of Iowa in 1998—the same year the parties were married. Thus, the entire amount of the IPERS pension was marital as of the date of the dissolution trial.

entitled "IPERS QDRO Instruction Packet" to her resistance for the court's information. The court summarily denied Ryan's posttrial motion on this issue.

Ryan then requested a hearing on the entry of the QDRO where he once again requested the provisions be included to protect this future interest in Mary's IPERS account. At the hearing, Ryan offered, and the court accepted, the testimony from Greg Schochenmaier, general counsel for IPERS, who testified regarding the various provisions Ryan wanted included in the QDRO and what those provisions accomplished. In rejecting Ryan's request again, the district court noted the evidence at trial regarding the retirement accounts "was not thorough, to say the least." The court considered the testimony offered at the hearing and declined to revise its rule 1.904(2) ruling related to the distribution of the retirement assets. The court stated it would enter a QDRO conforming to the requirements of the decree upon its submission by Mary's counsel.

We conclude there are no error preservation concerns as Ryan raised the issue of the requested QDRO provisions at the earliest opportunity—when he was made aware at trial that Mary had changed her position regarding the distribution of the IPERS account and was seeking for the account to be divided by a QDRO under the *Benson* formula. The specific language was included in Ryan's posttrial brief and his counsel also included IPERS information to the court for consideration in drafting the decree. It appears either the court did not see the information/request or decided against the language. The court then continued to reject the language offered on two more occasions—in the 1.904(2) motion decision and the hearing on the entry of the QDRO. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of

appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

We next consider how to equitably divide Mary's IPERS account. Ryan asserts that if the IPERS account is divided with a QDRO, language must be added to protect his future interest. In the alternative, he requests that instead of dividing the IPERS account with a QDRO we use the refund value of the account in the property distribution settlement and order Mary to pay him a property settlement payment equal to his share of the account. Mary requests the account be divided by a QDRO and conceded in the district court posttrial motions that she would agree to add language restricting her from taking the refund value of the account unless she first obtains Ryan's signature—paragraph c "[Mary] may not request a refund without [Ryan's] consent." We agree the addition of that language would protect Ryan's interest in the IPERS account if it were to be divided via a QDRO. The other three provisions Ryan requested are below:

> a. [Mary] shall name [Ryan] as her contingent annuitant under IPERS Option 4. [Ryan] shall receive a 50% joint and survivor death benefit payment under this option.
> b. [Ryan] shall be deemed to be a designated beneficiary with respect to pre-retirement death benefits under IPERS. [Ryan] shall be awarded the same percentage of death benefits as determined under the *Benson* formula.
> . . . .
> d. [Ryan] shall receive a share of any benefit increase to [Mary,] including cost of living, dividends or any other postretirement increase in the same proportion as the *Benson* formula.

Ryan claims these provisions protect his portion of Mary's account in the event of Mary's death, either preretirement (paragraph b) or postretirement (paragraph a).

He also claims the provisions permit him to benefit from any increase in the account that occurs after Mary retires but before the plan ceases (paragraph d).

It should be noted the district court did specifically consider and reject the provision outlined in paragraph (a) in the dissolution decree. The court stated:

> The Court agrees with Mary that Ryan's request for an order that Mary name Ryan as a "contingent annuitant" under IPERS Option 4 is not appropriate here. The Court agrees that Mary should be free to name the children or other beneficiaries as the beneficiary of her death benefits under IPERS in the circumstances here, particularly since Mary presumably will continue to accrue IPERS benefits after the dissolution and prior to her retirement.

Ryan concedes the postretirement death benefit language under option 4, would restrict Mary's choice of retirement payment options as that option has a lower monthly benefit amount due to the postretirement death annuity, but he claims without this language any interest he has in Mary's IPERS account would completely disappear at the time of her death.[3] Mary maintains she should be able to designate her postretirement death benefits to pass to whomever she chooses.

As to (b)—preretirement death benefits, Schochenmaier, IPERS general counsel, testified:

> Q. If a Qualified Domestic Relations Order is prepared simply giving the alternate payee [Ryan] 50 percent of the marital portion and there is no provision for a preretirement death benefit, will the alternate payee receive anything from IPERS if the

---

[3] We note per the information in the record, under Option 4, the monthly joint and survivor death benefit payments IPERS will make to the alternate payee cannot be subdivided. So if Mary is required to select Option 4 and name Ryan the alternate payee for the joint and survivor death benefit, she cannot split that death benefit and name another person to share the monthly payment with Ryan. She can only select one person who will receive upon her death a monthly payment equal to twenty-five, fifty, seventy-five, or one hundred percent of the monthly benefit amount she received during her retirement.

participant has not gone into pay status? A. No. The alternate payee would not receive anything.

Provision (b), requiring Mary to name Ryan as a beneficiary of any preretirement death benefits would provide Ryan security in his retirement funds in the event Mary dies prior to retirement. Without any such requirement, if Mary were to die prior to retirement, Ryan would lose any interest in his share of the marital portion of the IPERS payments. Finally, provision (d) stating Ryan should receive his portion of the cost of living, and dividend increases would entitle Ryan to the increases in proportion to his share of the IPERS pension under the *Benson* formula.

While the language Ryan requests, for the most part, would work to protect Ryan's future interest in his share of Mary's IPERS account, we determine it is more equitable in this case to value Mary's IPERS account at the refund value as of the time of trial and order a property equalization payment from Mary to Ryan, in lieu of dividing the IPERS account via a QDRO. The IPERS retirement options and the circumstances of the parties could be drastically different by the time the parties retire. This is the alternative remedy requested by Ryan, and it permits the parties to finalize their asset division without restricting the retirement planning of either party. Because we conclude the IPERS account should be valued at its refund value and divided with the other assets in the property distribution, we modify the district court's decree as will be outlined below.

## IV. Gifted, Inherited, and Premarital Funds.

Next, Ryan claims the district court should not have set aside to Mary the money she claimed to have received throughout the marriage as gifts from her parents or the inheritance she received from her grandfather. He also claims the court should not have set aside as premarital property the retirement account Mary established while working for a former employer.

Iowa Code section 598.21(6) (2011) provides:

> Property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage.

In considering whether it would be "inequitable" to Ryan or the children if the gifted or inherited funds are exempt from division, we consider the following factors

> (1) contributions of the parties toward the property, its care, preservation or improvement[];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter[,] which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*McDermott*, 827 N.W.2d at 679.

Ryan makes no argument that Mary's parents intended the gifts to be to both parties or that Mary's grandfather intended the bequest to be to both of them. *See id.* at 678-79 (noting "[t]he donor's intent and the circumstances

surrounding the inheritance or gift are the controlling factors used to determine whether inherited property is subject to division as marital property"). His argument centers solely on the assertion that Mary did not keep the inherited and gifted money separate from the joint funds of the family and used the funds to pay for family expenses. However, "it is important to note the act of placing gifts or inheritances received by one spouse into joint ownership and/or commingling the same with other marital assets is not controlling in deciding whether the property should be divided as a martial asset." *In re Marriage of Liebich*, 547 N.W.2d 844, 851 (Iowa Ct. App. 1996).

In the decree the district court concluded the gifts should be set aside to Mary, explaining,

> The Court finds and concludes that the undisputed evidence here is that most, if not all, of the gifts from Mary's parents to her were invested in the marital property and family expenses enjoyed by the family. The undisputed evidence, however, establishes by clear, convincing and satisfactory evidence the intent to make those gifts to Mary. . . . Therefore, such gifts are not subject to a property division except upon a finding that refusal to divide the property is inequitable to the other party or to the children. . . . The Court concludes that Ryan has not met his burden of establishing that refusal to divide the gifted property would be inequitable to either Ryan or the children.

The court likewise removed $8000 from the net assets allocated to Mary to account for the inheritance she received from her grandfather. Upon our de novo review of the record, we agree Ryan has failed to prove that it is inequitable to set aside to Mary the gifts and inheritance.

In addition, the district court awarded the value of a premarital IRA to Mary and then also removed it from the net assets allocated to Mary. A district court "may not separate [a premarital] asset from the divisible estate and automatically

award it to the spouse that owned the property prior to the marriage. Instead, property brought to the marriage by each party is merely one factor among many to be considered under section 598.21." *In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007) (quotation marks and internal citations omitted).

Again, Ryan's argument is that Mary failed to protect this premarital property through a prenuptial agreement and also failed to establish the value of this account at the time of the marriage. He claims she received the lion share of the marital property including the house, the more valuable car, and the household furnishing, while he only received an older vehicle, the proceeds of a four-wheeler, some household furnishings, and the dogs.

While Mary did receive more assets in light of the decree awarding her the marital home, she also received the majority of the liabilities, including multiple encumbrances against the house and loans that were incurred to operate the parties' now defunct dog kennel business. Mary did not contribute to this IRA over the course of the marriage, and it is logical to conclude the account increased in value as a result of market conditions during the fourteen-year marriage. In *In re Marriage of Hass*, 538 N.W.2d 889, 893 (Iowa Ct. App. 1995), our court noted:

> An additional factor in dividing appreciated property acquired before the marriage is whether the appreciation which occurred during the marriage was fortuitous or due to the efforts of the parties. An equitable property division of the appreciated value of the property should be a function of the tangible contributions of each party and not the mere existence of the marital relationship. Where the accumulated property is not the product of the joint efforts of both parties, or where, as here, one party brings property into the marriage, there need not necessarily be a division. This is especially true where the marriage was of short duration.

(Quotation marks and internal citations omitted.) Here, the IRA was funded with only premarital assets and increased in value only as a result of market conditions and not through the tangible contributions of either party during the marriage. We therefore conclude it is not inequitable to set aside this account to Mary as premarital property.

Likewise, Ryan's premarital IRAs should also be set aside to him. With the addition of the refund value of Mary's IPERS account, Mary was awarded a net value of $111,493.65 in joint assets, and Ryan is now awarded $27,566.50 after subtracting out to Ryan his Morgan Stanley IRA worth $1187.00 and his TransAmerica IRA worth $4885.00. In order to achieve equity as to the property distribution between the parties, we modify the decree to require Mary to pay to Ryan a property equalization payment of $41,963.58. The payment should be made within one year of the issuance of procedendo, and it may be made through the payment of cash or the transfer or roll-over of Mary's retirement funds.

We therefore affirm the court's decision to set aside to Mary the gifts, the inheritance, and the premarital IRA; however we modify the property distribution to set aside to Ryan his premarital IRAs and to award him a property equalization payment to account for the IPERS account awarded to Mary. We value the account at its refund value as of the date of the dissolution trial.

**V. Attorney Fees.**

Both parties request an award of appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "In determining

whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa Ct. App. 1997). Having considered these factors, we award Ryan $2000.00 in appellate attorney fees.

**VI. Conclusion.**

We modify the court's dissolution decision to award Mary's IPERS account to her, and value it at its refund value as of the time of trial for purposes of the property distribution. We affirm the court's decision to set aside to Mary the gifts, the inheritance, and the premarital IRA; however, we modify the property distribution to set aside to Ryan his premarital IRAs. Finally, we modify the dissolution decree to order Mary to pay to Ryan a property equalization payment of $41,963.58 to be made within one year of the issuance of procedendo, and it may be made through the payment of cash or the transfer or roll-over of Mary's retirement funds.

Costs in this case are assessed one-half to each party.

**AFFIRMED AS MODIFIED.**