# IN THE COURT OF APPEALS OF IOWA

No. 16-1637
Filed August 16, 2017

IN RE THE MARRIAGE OF EMILY DYVIG
AND BRANDON DYVIG

Upon the Petition of
EMILY DYVIG,
    Petitioner-Appellant,

And Concerning
BRANDON DYVIG,
    Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Michael D. Huppert,

Judge.


        An ex-wife appeals the economic provisions of a dissolution decree.

**AFFIRMED.**


        Andrea M. Flanagan of Flanagan Law Group, P.L.L.C., Des Moines, for

appellant.

        James W. Thornton of Thornton & Coy, P.L.L.C., Ankeny, for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Emily Dyvig (now Emily Abbott) appeals economic provisions in the decree dissolving her marriage to Brandon Dyvig. She asserts the district court should have: (1) rejected the parties' mediation agreement resolving financial issues, (2) awarded her alimony, (3) required Brandon to pay a larger share of uninsured medical expenses, and (4) ordered Brandon to pay her trial attorney fees. Both Emily and Brandon seek appellate attorney fees. Finding the district court properly adopted the mediation agreement and equitably resolved the remaining issues, we affirm. We decline to award appellate attorney fees.

## I.    Facts and Proceedings.

Emily and Brandon, both from Webster City, started dating when she was in eighth grade and he was in eleventh grade. They stopped dating while Brandon was in college but resumed their relationship in 2001. At that time, Brandon was working at Winnebago Industries, a recreational vehicle (RV) manufacturer, in Forrest City. Emily lived at home, attended community college, and worked as a licensed practical nurse. In 2003, Brandon transferred to Winnebago in Seattle. After several months, Emily left school and joined him in Seattle, where she found a full-time job at a hospital.

Brandon and Emily married in September 2004, and had three children, who were born in 2005, 2007, and 2010.[1] Before the birth of their oldest child, Emily had serious health concerns.[2] After that child was born, Emily worked as a

---

[1] Each child has experienced various health problems, including seizures, asthma, and kidney issues.

[2] Emily's health issues continued beyond her pregnancies, and by the time of trial, she had undergone more than twenty surgeries for different conditions.

nurse one day per week, and Brandon worked from home on those days. In the spring of 2007, they bought a house in Seattle. Because RV sales were good, Brandon earned as much as $140,000 a year. But the parties started experiencing financial trouble in the 2009 recession. House prices declined; and Brandon's sales volume slowed considerably—in one of his last years in Seattle, he earned only his $52,000 base pay. The parties could not afford their home.[3] Medical bills for Emily and the children also affected their finances.

Brandon accepted a new position at Winnebago in Minneapolis shortly after the birth of their third child in October 2010, and the family moved in the spring of 2011. They were happy to be back in the Midwest where both sets of grandparents resided but lost more than $150,000 in a short sale of their Seattle house. In Minnesota, the parties rented a residence and tried to dig out of their financial problems. Emily was not employed, devoting her efforts to caring for the three young children.

Brandon's position with Winnebago in Minnesota required frequent travel. But in the fall of 2012, he accepted a new job with Mechdyne Corporation, a software developer, in Marshalltown, Iowa, where he worked more regular hours and was home on the weekends. Brandon's base pay at Mechdyne was $70,000, but his overall yearly income varied according to his commissions. The parties bought a home in Ankeny, and Brandon commuted to Marshalltown. In 2013, Emily worked twelve-hour shifts as a nurse on the weekends for one year. But Emily's nursing license was suspended for misconduct and she was unable

---

[3] Brandon explained: "We stopped payments on the house, our credit was hit, and we just washed our hands and moved on after that. There was just no other option for us."

to work as a nurse for the next year, which increased the family's existing financial stress.

In August 2015, Emily was allowed to resume employment as a nurse. Also that month, Emily filed a petition to dissolve the eleven-year marriage, and the parties separated. Emily remained in the family home, and Brandon eventually moved into a duplex in Ankeny.

In September 2015, Emily made plans to return to work. Also that month, the parties filed a stipulation on temporary matters, which the court adopted.[4] The parties agreed to file a joint chapter 7 bankruptcy. In the dissolution case, both parties filed an affidavit of financial status in December 2015. Emily's conclusory affidavit did not list any IRA retirement accounts. Brandon's affidavit listed $2500 in Scottrade IRAs and $95,000 in his Mechdyne 401(k) account.

Emily planned to move with the children to Webster City in the summer of 2016 and live with her parents. Emily's father advanced mortgage payments for their Ankeny home, and the sale closed on June 1, 2016. Emily believed her father would buy or rent a house in Webster City for Emily and the children. Emily also told the custody evaluator "she was unsure how much longer she would be working because she was unsure if her income would be needed after the divorce." Emily continued: "[T]he amount of child support would determine her decision about future employment."

---

[4] The parties agreed to Brandon paying $1300 temporary monthly child support and providing the children's health insurance. He also paid all uncovered medical expenses after Emily paid the first $250 per year per child. While Brandon did not pay temporary spousal support, he paid "the water bill, electric bill, and Mediacom bill for the marital home until Emily commences full-time employment or December 31, 2015, whichever first occurs." Brandon also paid the Lexus payment and car insurance for the Lexus during the dissolution action.

The parties later abandoned their plan to file bankruptcy and instead agreed to mediate their financial issues. After a successful mediation, they entered into a "final agreement relative to financial matters" on March 28, 2016. Noting approximate net proceeds of $40,000 from their pending home sale, they agreed to first repay $17,920.72 owed to Emily's father and then use excess proceeds to pay down other marital debts as follows:

> a. Brandon will take out a loan on his 401(k) to pay the remaining balance of this debt.
> b. Half of the amount of this indebtedness shall be taken from Emily's share of the 401(k).
> c. Additionally, Emily's portion shall be reduced by $10,000 for the offset of the vehicles.[5]

The April 5, 2016 uniform trial scheduling order instructed the parties to file current financial statements ten days before trial. Brandon complied, submitting a July 17, 2016 affidavit that showed the house sale had closed and $25,000 remained in escrow for disbursement toward credit card debts. Brandon's affidavit also showed his 401(k) balance remained at $95,000 and his Scottrade IRA was now $97.80. Emily did not file a new financial affidavit.

A two-day trial was held in late July 2016.[6] At the start of trial, Emily sought to have the parties' mediation agreement set aside. The court declined.

---

[5] Emily's Lexis had a net value of $10,000. Brandon's car was leased, had no net value, and carried debt of $16,500.

[6] At the time of trial, Emily was thirty-two and Brandon was thirty-six years old.

On August 15, 2016, the court entered its decree, granting joint legal custody and physical care to Emily with visitation for Brandon.[7] In calculating child support, the court used Brandon's base pay of $70,000, a "known quantity." For three children, the court ordered Brandon to pay $1139.65 per month, based on Emily's $33,828 and Brandon's $51,551 net annual incomes.[8] The court also adopted Brandon's proposal that he pay Emily a percentage of each commission he receives for child support by ordering Brandon to pay 26.5% within seven days "while there are three minor children to support." The court declined Emily's request for $24,000 annual alimony for four years. Finally, the court ordered each party to pay their own attorney fees and split court costs.

Emily retained new counsel and now appeals.

## II.    Standard of Review

We review equity actions, including dissolutions of marriage, de novo. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). De novo review means we examine the entire record and adjudicate the issues anew. *See id.* While not binding, we give weight to the district court's factual findings, particularly concerning witness credibility. *See* Iowa R. App. P. 6.904(3)(g). We will disturb the district court's rulings only when they fail to provide an equitable resolution. *See McDermott*, 827 N.W.2d at 676.

---

[7] The parties do not challenge the custody or child-support provisions of the decree.
[8] Emily works thirty-six hours per week as a pediatric intensive care home nurse for Iowa Home Care. The district court determined her yearly salary was $40,694. When child support is added to Emily's net annual income, her annual income is $47,503. When child support is deducted from Brandon's net annual income, he has $37,875 "base" income without commissions.

### III. Analysis

### A. Mediation Agreement

On appeal, Emily challenges the court's denial of her request the mediation agreement be set aside.

"A stipulation and settlement" in dissolution proceedings is "enforceable like any other contract, and a party may not withdraw or repudiate the stipulation prior to entry of judgment by the court." *In re Marriage of Jones*, 653 N.W.2d 589, 593 (Iowa 2002); *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996) (same). But the parties' stipulation is not binding on the court because it must still determine whether the stipulation "is unfair or contrary to law." *Ask*, 551 N.W.2d at 646 (noting "court retains the power to reject the stipulation"). It is not required that the parties' solution be the solution the court itself would have adopted if it were adjudicating the controversy. *Id.*

To resolve Emily's claim, we turn to the trial transcript. Emily's counsel told the court: "Pursuant to the terms of the mediation agreement, the parties did reach a resolution on all financial matters on a permanent basis." Counsel then noted the agreement was contingent "upon three things occurring" and argued Brandon met two conditions but not the paragraph stating: "Emily is awarded her Roth IRA (Scottrade ****52). Brandon shall provide the log-in information on this Scottrade Account to Emily." Emily's counsel argued Brandon did not provide the log-in, and Emily, by guessing passwords, accessed the account and "discovered that there was no money in it. Her understanding, obviously, is that it would not have even made sense for her to agree to the awarding of the Roth

IRA had she known that it had a zero balance in it." Based on this alleged discrepancy, counsel asked the court to invalidate the mediation agreement.

Upon questioning by the court, Emily's counsel clarified she had no other objections to the agreement and also stated:

> The terms of the agreement speak for themselves. She does have concerns about where significant monies have gone during the course of the relationship, but, no, the other terms—if it's found that [Brandon] met his obligations, the terms were agreed to, and both parties were present and represented by counsel.

Brandon's attorney asserted Brandon had complied with the agreement, claiming Brandon was "never asked separately for the log-in to the Scottrade account." Also, Brandon's December 2015 financial affidavit showed "$2500 at the time of mediation in the Scottrade accounts," but counsel did not know Emily's balance. "But we would agree at this point the value of all the accounts has been diminished, and that's shown on our most recent financial affidavit."

The court asked each attorney to explain his understanding of activity in the Scottrade accounts between the March mediation and Brandon's July financial affidavit. Brandon's attorney stated there was no activity in Brandon's accounts and information as to Brandon's accounts was provided to Emily's counsel. "We weren't able to provide hers because they said that she needed to call in and get those statements because it was her accounts, not [Brandon's]." The following exchange occurred between the court and Emily's attorney:

> EMILY'S COUNSEL: [M]y understanding is that [Brandon] had a separate IRA account that had a balance of $2500 on the date of the mediation in this matter. Subsequent to that date, the funds were in an exchange traded fund, to the best of my knowledge, that just sort of goes down over time given the nature of the financial vehicle. It's my understanding as we sit here today that there is no money in any Scottrade accounts.

THE COURT: And so do I take that to mean . . . that whatever occurred between March and July, it's not a question of [Brandon] actively dealing in that account in a way that caused that asset to be dissipated. It just dissipated itself because of the nature of the vehicle?

EMILY'S COUNSEL: That's correct . . . [t]here's no claim of dissipation of assets from the date of mediation agreement to present.

The court ruled there was no "viable basis" to void the parties' mediation agreement, finding there was "sufficient disclosure and an obvious concerted effort by both parties" to resolve the "significant financial issues arising out of the marriage" and their mediation agreement provided "a reasonable approach to resolving these issues." The court then accepted the mediation agreement and directed: "[T]here will be no other issues under the category of property and debts that will remain contested for trial."[9]

On appeal, Emily asserts the "district court erred by failing to make an equitable division of the parties' assets and debts" because the record shows "an unexplained disappearance of the parties' retirement accounts." She claims Brandon failed to account for $20,000 disappearing from her Scottrade account.

We reject her assertion. Emily did not submit a financial affidavit showing she held $20,000 in a Scottrade account. Neither did Brandon. Recognizing she needs support for her appellate argument, Emily cites the "Capital Gains and Losses" forms for the parties' 2012, 2013, and 2014 joint tax returns. But Emily

---

[9] Later in the trial, when Emily's counsel asked if she was requesting the court "just simply provide that the retirement accounts are both awarded to each of you individually," the court interrupted to ask whether that matter had been addressed in the mediation agreement. When counsel admitted it was, the court stated: "I've already approved that, so that's not a contested issue."

does not explain how these exhibits, which do not mention either Scottrade or $20,000, advance her argument.[10]  Emily fails to support her position.

In a single unsourced paragraph, Emily contends the district court "failed to value the dissipated or concealed assets identified in Exhibit 50."  That trial exhibit is a cryptic spreadsheet entitled "Distributions and Losses by Year," containing a right-hand column listing years 2012 through 2015, a middle column labelling each year as either distribution or loss, and a left-hand column identifying the amount of distribution or loss for each year.  A 35% tax rate and a 10% early withdrawal penalty are applied to the subtotal, for a total of $72,938.  Neither at trial nor on appeal does Emily explain the source for any amount in the spreadsheet.  Yet Emily claims her spreadsheet demonstrates dissipation and argues: "Inclusion of one-half [of] the dissipated or concealed assets should be awarded to Emily in a cash settlement [in] a $36,469 judgment against Brandon."

First, while it is unclear what the spreadsheet is intended to show, it does not show dissipation.  Second, Emily's attorney told the court "the parties did reach a resolution on all financial matters on a permanent basis."  Third, Emily's attorney stated, other than the dispute regarding the Scottrade account, Emily had "no other objections to the agreement" and is not claiming "dissipation of assets from the date of mediation agreement to [trial]."  On de novo review, we

---

[10] Specifically, the capital loss exhibits Emily cites on appeal show the parties took a $37,678 loss on their sale of Purespectrum, Inc. in 2012.  The parties then applied $3000 of that loss each year in 2012, 2013, and 2014 to shelter and reduce their income.  The other exhibits cited by Emily are also irrelevant to her argument.  One shows the loss on the sale of their Seattle home, and the other shows Brandon owed over $9000 in student loan debt in 2006.

affirm the district court.[11]  *See Jones*, 653 N.W.2d at 593; *Ask*, 551 N.W.2d at 646.

### B.  Spousal Support

Alimony, or more formally spousal support, "is a stipend to a spouse in lieu of the other spouse's legal obligation for support."  *In re Marriage of Tzortzoudakis*, 507 N.W.2d 183, 186 (Iowa Ct. App. 1993).  The ability of one spouse to pay alimony must be balanced against the needs of the other spouse. *Id.*  We measure "need" objectively by what is required for a "spouse to become self-sufficient at a standard of living reasonably comparable to that enjoyed during the marriage."  *In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015). Here, both parties will be required to observe a lower standard of living because they lived beyond their means during the marriage.  We also consider the property settlement in evaluating the alimony award.  *See In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997).

At trial, Emily sought spousal support in the amount of $2000 per month for four years.  She explained how she arrived at her request: "We've been married for twelve [years].  I was a stay-at-home mom, and I didn't work.  I was not able to get any retirement for myself while I was a stay-at-home mom.  I feel a stay-at-home mom is a full-time job, and I feel that that's not asking for much." Emily also based her request on Brandon's current pay stub that showed his income was about $75,000 for the first half of 2016.

---

[11] We decline to address the issue of fraudulent inducement that Emily raises for the first time in her reply brief as a ground for setting aside the mediation agreement.  *See Figley v. W.S. Indus.*, 801 N.W.2d 602, 608 (Iowa Ct. App. 2011) (citing *Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992) ("[W]e have long held that an issue cannot be asserted for the first time in a reply brief.")).

Brandon resisted, pointing out his income for 2016 could be close to $150,000 with commissions but that amount was "not guaranteed." Brandon explained: "If I can make [$150,000, it] would be the best year I've ever had in my entire career." Brandon noted his annual income varies widely; he earned $71,000 in 2015 and $94,700 in 2014. Thus, in "any given year" his income could be between his $70,000 base salary and $150,000.[12] Although Brandon offered to pay $7600 ($334/month) to extinguish the debt on Emily's Lexus as a contribution to her spousal support, he asserted he could not pay $2000 a month from his $4296 net monthly "base income" after he pays his own monthly expenses ($4445) and child support ($1140). Brandon also noted, while his expenses included $1550 monthly rent, Emily will not pay either rent or child care. Their youngest child is in kindergarten, and Emily's mother quit her job to provide child care. Emily's parents testified to remodeling their home to provide more bedrooms, stating Emily and the children were welcome to live there as long as they wanted.

Brandon pointed out Emily is leaving the marriage with the same retirement that he has—one-half of his 401(k). Specifically, the parties had very little cash—there are no savings accounts and no retirement accounts other than his 401(k) "that we've split," so he has no accounts from which to pull spousal support. Also, his company does not allow him to take a draw against future commissions. As to the parties' credit card marital debt,[13] Brandon testified, after using the $25,000 house proceeds to pay it down, he is "going to negotiate debt

---

[12] Brandon's highest annual income was $140,000, while working in Seattle, in contrast to the fifteen months in Seattle when he earned only his base pay of $52,000.
[13] Brandon's July 2016 financial affidavit listed credit card debt totaling $44,500.

with the four credit card companies. It depends on what we're able to negotiate, but generally it's a lot lower . . . . The remaining would be a loan out of the 401(k), but [it] is approximately [$95,000], so it wouldn't wipe that out."

The district court found Emily was "requesting what appears to be rehabilitative alimony, presumably to assist in whatever efforts she will be undertaking to further her professional education" as Emily desired "to obtain her bachelor's degree in nursing." The court was not convinced spousal support was appropriate. Observing the purpose of rehabilitative alimony is to create incentive and opportunity for the receiving spouse to become self-supporting, the court noted Emily was "currently employed within her chosen field and has expressed confidence in her ability to maintain that employment." The court also considered that Brandon would be "paying a considerable amount in child support"—as well as 26.5% of any commissions he will earn—during the four years for which Emily sought alimony. "Looking at the parties' respective budgets," the court concluded Brandon was "not in a position" to pay alimony to Emily and "she has not established the need for that support."

On appeal, Emily requests "at least $780 monthly alimony." She recognizes she has more net monthly income than Brandon after he pays child support. But Emily argues the "district court appears to have over-emphasized the property settlement" and "placed too much emphasis on Brandon's inability to pay the requested rehabilitative alimony." Based on yearly earnings of $150,000, Emily calculates Brandon would have more than $1500 per month in commission income with which to pay alimony, even after paying a percentage of his commission income toward child support.

After our de novo review, we agree with the district court. Contrary to Emily's position, we conclude the district court achieved equity between the parties. "Alimony is not an absolute right; an award depends upon the circumstances of each particular case." *In re Marriage of Miller*, 532 N.W.2d 160, 162 (Iowa Ct. App. 1995). The parties leave this marriage with no home equity, $10,000 in equity in Emily's Lexus, and one major asset—Brandon's 401(k), which they split equally after accounting for the Lexus's equity and paying off credit card debt with a loan on their only significant asset. Brandon's total monthly outlays with child support are $5585, a sum exceeding his $4296 net monthly "base income" by $1289. Thus, Brandon will need to earn more than $15,000 in annual net[14] commission income to meet his obligations. In addition, when Brandon has good sales and good commissions, he will pay 26.5% of that commission within seven days for additional child support. Based on the specific circumstances of the parties, we agree with the district court's determination.

### C. Unreimbursed Medical Expenses

Emily notes the district court used Brandon's base income to determine the division of unreimbursed medical expenses at Brandon 60% and Emily 40%. Emily asks that we incorporate Brandon's commission income in setting the percentages and order Brandon to pay 75% of these expenses. Brandon responds Emily's suggestion would "punish" him in the years in which he has no commission income. Brandon asserts the court properly used "base" incomes in determining both child support and unreimbursed medical expenses.

---

[14] Net in this instance means after paying a share in child support and after paying taxes on commission income.

Because Brandon's income varies widely and because Brandon will pay a portion of his commission income in child support, we deny Emily's request.

**D. Trial Attorney Fees**

On appeal, Emily seeks to have Brandon pay $23,995, all of her trial attorney fees and costs. She asserts Brandon receives large commission payments and has "far more annual income than Emily even after child support is deducted."

The district court's award of trial attorney fees is discretionary. *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa Ct. App. 1997). Any attorney fee award must be "fair and reasonable in light of the parties' financial positions." *In re Marriage of Grady-Woods*, 577 N.W.2d 851, 854 (Iowa Ct. App. 1998). After analyzing the appropriate factors, the district court concluded: "Based on the information supplied," Brandon is not in a position to pay toward Emily's attorney fees. Specifically, the "agreed-to property division has taken what little liquidity that may have existed and applied it to marital debt, such that [Brandon] is not in a position to contribute to [Emily's] fees."

Emily must show an abuse of the district court's discretion before we will interfere. *See id.* Emily benefits from Brandon's commissions through increased child-support payments. We find no abuse of discretion.

**E. Appellate Attorney Fees.**

Finally, both parties request appellate attorney fees—Emily asks for $10,000, and Brandon seeks $5000. Although we do not award appellate attorney fees as a matter of right, we may do so as a matter of discretion. *See In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016). In

exercising our discretion, "we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Id.*

Here, neither party has home equity or other significant assets; indeed, the parties' temporary agreement contemplated a joint bankruptcy, and the mediated financial agreement required Brandon to take out a loan against his 401(k), the parties' only significant marital asset, to pay off credit card debt. While Brandon was required to defend the decree, he also earns more annual income than Emily and has no alimony obligation. After considering these factors, we decline to award appellate attorney fees.

The dissolution decree is affirmed in its entirety. Costs on appeal are assessed one-half to each party.

**AFFIRMED.**