**IN THE COURT OF APPEALS OF IOWA**

No. 14-1231
Filed June 10, 2015

**DANIEL JAMES REES,**
        Petitioner-Appellant,

**vs.**

**KATELYNN PAULENA CALEF,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Marshall County, James A. McGlynn, Judge.


        Daniel Rees appeals the district court's order granting sole legal and physical custody of the parties' son to Katelynn Calef, and otherwise rejecting Rees's request for joint custody.  **AFFIRMED IN PART AND REVERSED IN PART.**


        Barry S. Kaplan of Kaplan & Frese, L.L.P., Marshalltown, for appellant.

        Lawrence B. Cutler of Craig, Smith & Cutler, L.L.P., Eldora, for appellee.


        Considered by Vogel, P.J., and Doyle and McDonald, JJ.

**VOGEL, P.J.**

Daniel Rees appeals the district court's order granting sole legal and physical custody of the parties' minor son to Katelynn Calef.  Calef defends the district court's ruling and requests the award of appellate attorney fees.  In light of the court's finding Calef has been the child's primary caretaker since birth, and the child is doing well in her care, we conclude the court properly granted physical care to Calef, subject to Rees's liberal rights of visitation.  However, we conclude there was not clear and convincing evidence to support granting sole legal custody to Calef.  We therefore reverse as to that issue and grant joint legal custody to the parties.  We also award Calef her requested appellate attorney fees.

**I. Factual and Procedural Background**

Rees and Calef were never married nor have they ever resided together.  Their son, J.R., was born in September 2012.  Calef did not believe nor acknowledge she was pregnant until shortly before J.R.'s birth, and therefore received no prenatal care.  J.R. suffers from amniotic band syndrome, a random defect that caused him to not have parts of several fingers, and he is also missing one toe.  This requires surgery and other corrective measures; however, these issues are being appropriately addressed.  Otherwise J.R. is developmentally on track and in good health.

Calef has been J.R.'s primary caretaker since birth.  There was, at least initially, a tacit agreement between the parties that, because Calef was breastfeeding, J.R. would remain in her care on a full-time basis.  Rees has continually exercised regular visitation on a schedule arranged by the parties and

has paid child support, without a court order requiring he do so. He and his family have also provided items such as clothing, diapers, and baby food for J.R.

Calef lives with her mother in Steamboat Rock, Iowa. She is employed part-time at Fareway, earning approximately $7254 annually, and has a high school education. She is able to have a flexible work schedule and when J.R. is not with Rees, Calef's mother cares for him while Calef is at work. She does not rely on her mother to take care of J.R. when she is at home.

Rees lives with his parents in Marshalltown, Iowa. He has completed both an associate of arts and an associate of applied science degree. At trial, he testified he was offered a job as a web developer and will soon earn $40,000 annually, with benefits. This job is located in West Des Moines. Rees testified he plans to continue living with his parents until he can move to Ames, where other family members reside, and then commute to work.[1] Rees provides care for J.R. during his visitation, but relies on his family to provide care when he is at work.

Rees and his family are very involved in their church. J.R., with Calef's consent, was baptized in the church, and before their relationship ended, Calef took instruction in, but never joined, the church. Calef describes the church as "fire and brimstone" but is otherwise supportive of J.R.'s involvement in the church when he is with Rees. Rees's mother, father, and sister have all expressed some general disapproval of Calef, particularly with regard to her lack of involvement in the church.

---

[1] It is approximately an one-hour drive from Marshalltown to West Des Moines, one way, and from Ames to West Des Moines the commute is forty-five minutes.

There was one incident of domestic abuse in this case.[2]  On September 12, 2013, the parties were walking with J.R. in a stroller when they began to argue.  Rees then backhanded Calef in her side.  This resulted in bruising, and, following a hospital visit, it was determined Calef suffered no internal injuries.  Rees pled guilty to a misdemeanor domestic assault and received a deferred judgment.  A no-contact order was issued as part of the criminal case, but was later modified to facilitate limited contact between the parties in order to care for J.R.[3]  As of the date of the custody trial, Rees had completed the batterer's education program and his record was expunged.

The parties have difficulty communicating, in part due to the incident of domestic violence and the no-contact and protective orders.  For example, Calef believes J.R. is allergic to milk and requested that the Rees family feed him soy-based products; however, the family failed to do so and Calef attributes a severe diaper rash to this non-compliance.  Nor could the parties agree on small issues, such as the type of cream to be used to treat the rash.  Rees asserts he and Calef have been able to successfully resolve many other—and larger—issues.

---

[2] Calef also testified Rees was extremely controlling and domineering during the visitation exchanges; specifically, she recounted instances shortly after J.R.'s birth when Rees would drive to a secluded place and demand sexual intercourse, despite the fact doctors recommended Calef not engage in sexual activities until six weeks following J.R.'s birth.  Calef stated that the car, when stopped, would not retain heat in the winter or stay cool in the summer, and that Rees would not drive away for an hour if she did not "give in."  J.R. was present in the car when these instances occurred.  Consequently, Calef testified she occasionally acquiesced to the demands for sexual intercourse because "[J.R.] wasn't going to stay warm forever in the back of that car in the middle of winter."  Rees denied ever forcing Calef into unwanted sexual intercourse, and he maintained Calef wanted to accompany him to that location.  The district court, in noting this situation, stated: "[T]he testimony left the Court with the impression that from Katelynn's viewpoint the boyfriend/girlfriend relationship has terminated, but that Daniel may still wish to have a relationship with Katelynn.  Joint custody should not be used as a pathway to pursue unrequited romance."

[3] Calef also obtained a protective order under Chapter 236 (2013).

The record does demonstrate Rees attempted to establish Calef was a poor caregiver, so as to favorably position himself as the better caregiver. Approximately one year before trial, he complained to the Department of Human Services (DHS) that J.R. was being abused and neglected because of "the medication and the having trouble breathing due to the smoke." A DHS worker dropped by Calef's residence unannounced and did not observe anything that would be of concern. The report came back unfounded. Rees also took J.R. to the doctor and presented concerns J.R. was not developing properly; however, the doctor's examination established J.R. was healthy and developmentally on track. Additionally, Rees took photographs of peeling wallpaper and cracked tile in Calef's home, which were entered into evidence at trial. His mother took pictures of the outside of the home, which were also entered into evidence, both attempting to illustrate flaws with the home.

Rees filed a petition seeking physical care and joint legal custody of J.R. on September 26, 2013. A contested hearing was held on May 20, 21, and 22, 2014. In an order dated June 17, 2014, the district court granted sole legal and physical custody of J.R. to Calef, subject to Rees's reasonable and liberal rights of visitation. Rees filed a motion to amend or enlarge, which, except for some minor issues which were not resisted by Calef, the district court denied. Rees appeals, requesting that we establish joint legal custody and joint physical custody.

**II. Standard of Review**

We review custody awards de novo. *In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995). Our primary consideration is the child's best interests. *Id.*

**III. Legal Custody Determination**

Rees first argues the facts of the case do not support the award of sole legal custody to Calef. Legal custody constitutes parental rights and responsibilities that include but are "not limited to decision making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5) (2013). Joint legal custody means that "neither parent has legal custodial rights superior to those of the other parent." *Id.* § 598.1(3).

Rees asserts the district court did not consider the totality of the circumstances, as outlined by the factors set forth in Iowa Code section 598.41(3)(a)–(k) in making its determination. He places particular emphasis on the district court's observation that both parents are suitable caretakers and love J.R., which, under paragraph (3)(a), supports the award of joint legal custody.

Iowa Code section 598.41(1)(a)[4] states:

> The court may provide for joint custody of the child by the parties. The court, insofar as is reasonable and in the best interest of the child, shall order the custody award, including liberal visitation rights where appropriate, which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated or dissolved the marriage, and which will encourage parents to share the rights and responsibilities of raising the child unless direct physical harm or significant emotional harm to the child, other children, or a parent is likely to result from such contact with one parent.

*Id.* § 598.41(1)(a). Our case law notes joint legal custody is preferred because it encourages parents to share the rights and responsibilities of child rearing as well as maximizes the child's contact with both parents. *In re Marriage of*

---

[4] Iowa Code section 600B.40 requires the court to consider the factors set forth in section 598.41 when making custody determinations as to a child born out of wedlock.

*Weidner*, 338 N.W.2d 351, 359 (Iowa 1983); *see also* Iowa Code § 598.41(3). Additionally, the factors the court must consider in determining what is in the child's best interests are:

> a. Whether each parent would be a suitable custodian for the child.
> b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
> c. Whether the parents can communicate with each other regarding the child's needs.
> d. Whether both parents have actively cared for the child before and since the separation.
> e. Whether each parent can support the other parent's relationship with the child.
> f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
> g. Whether one or both parents agree or are opposed to joint custody.
> h. The geographic proximity of the parents.
> i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
> j. Whether a history of domestic abuse . . . exists. In determining whether a history of domestic abuse exists, the court's consideration shall include but is not limited to . . . the issuance of a protective order against the parent or the issuance of a court order or consent agreement pursuant to section 236.5 . . . or a conviction for domestic abuse assault pursuant to section 708.2A.

Iowa Code § 598.41(3)(a)–(j).

We conclude clear and convincing evidence does not support the grant of sole legal custody to Calef. *See* Iowa Code § 598.41(2)(a)–(b) (noting "that joint custody is unreasonable and not in the best interest of the child to the extent that the legal custodial relationship between the child and a parent should be severed"). The court found both parents to be suitable caretakers for J.R., and the evidence supports this observation. J.R. is well cared for while visiting Rees,

Rees and his family provide all necessities for J.R., and they are otherwise very involved in his life. There was also testimony to the effect the parties are able to work together to resolve major issues regarding J.R., such as medical care for his disability.

Moreover, the cases in which sole legal custody is granted to one parent demonstrate this occurs when the other parent is incapable of caring for, or making decisions regarding, the minor child with the other parent. *See generally In re Marriage of Gensley*, 777 N.W.2d 705, 715 (Iowa Ct. App. 2009) (holding sole legal custody was properly granted to the mother because of the absolute inability of the father to communicate with the mother, and the children were suffering due to the acrimonious relationship between the parents); *In re Marriage of Liebich*, 547 N.W.2d 844, 849 (Iowa Ct. App. 1996) (affirming the district court's order granting sole legal custody to the father, as the mother was incapable of supporting the child's relationship with the father). That is not the case here. Nor is the single incident of domestic abuse in this case so severe that it warrants granting sole legal custody to Calef. *See In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997) (noting: "It is for the court to weigh the evidence of domestic abuse, its nature, severity, repetition, and to whom directed, not just to be a counter of numbers"). Consequently, we reverse the portion of the district court's order granting sole legal custody to Calef, and conclude joint legal custody should be established.

**IV. Physical Custody Determination**

We next consider whether the district properly granted physical custody or care of J.R. to Calef, rather than joint physical custody. In doing so, we consider

the same non-exclusive factors set forth in Iowa Code section 598.41. *See In re Marriage of Winters*, 223 N.W.2d 165, 167–68 (Iowa 1974); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007) (citing section 598.41(5)(a) and stating: "Any consideration of joint physical care . . . must still be based on Iowa's traditional and statutorily required child custody standard—the best interest of the child").

While both parents would be suitable custodians, their inability to communicate effectively regarding the majority of J.R.'s needs, along with the degree of discord, counsels against a joint physical care situation. *See Hansen*, 733 N.W.2d at 700–01. The record demonstrates Rees is not supportive of Calef's relationship with J.R., as shown by the DHS report and subsequent investigation, the fact he took J.R. to the doctor in an attempt to show he was not being well cared for while in Calef's care, as well as the Rees family's general disapproval of Calef. *See id.* § 598.41(3)(e). Nor will J.R. suffer from a lack of attention from Rees, given he has liberal rights of visitation that Calef is willing to facilitate. *See id.* § 598.41(3)(b).

Additionally, the domestic abuse incident is concerning. While there was only one incident of physical abuse, testimony established Rees is still controlling of Calef. The district court observed that this was a situation in which Rees was attempting to use visitation as a means to reestablish a romantic relationship with Calef. While we are not bound by the district court's findings of fact, they are nonetheless persuasive, given the court had the opportunity to view the parties and hear the testimony. *See In re Marriage of Brown*, 487 N.W.2d 331, 332 (Iowa 1992). Thus, we agree with the court the domestic abuse and control

issues present in this case, while not strong enough to support granting sole legal custody to Calef, is an important factor that counsels against a joint physical custody arrangement. *See Winters*, 223 N.W.2d at 167 (noting the factors considered for physical custody are substantially similar to those considered in the legal-custody determination); *see also* Iowa Code § 598.41(3)(i) & (j).

We also note that continuity of care is an important consideration when determining the child's best interests. *See Hansen*, 733 N.W.2d at 700–01. J.R. has been in Calef's care since birth. He is thriving in that environment, considering he is developmentally on track and is otherwise well cared for, particularly given his disability. Additionally, if joint physical care was awarded, the large bulk of J.R.'s care would fall to Rees's family members during J.R.'s time with Rees. As Rees testified, this is due to the fact he would be gone most of the day during his work week because of his long commute. Consequently, to provide continuity and maintain J.R.'s current environment, the award of physical care to Calef, rather than joint physical custody, is proper. *See id.*; *see also* Iowa Code § 598.41(3)(d).

## V. Appellate Attorney Fees

Calef also requests an award of $1250 in appellate attorney fees. The award of these fees is not a matter of right but is within our court's discretion. *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa Ct. App. 1997). When exercising this discretion the court considers "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Id.*

Upon consideration of these factors, particularly the ability to pay, we award Calef her requested $1250 in appellate attorney fees.

For these reasons, we affirm the order of the district court with regard to the physical custody determination, but reverse the legal custody portion so as to award joint legal custody to the parties. Additionally, we award Calef $1250 in appellate attorney fees.

Costs assessed to Rees.

**AFFIRMED IN PART AND REVERSED IN PART.**