# IN THE COURT OF APPEALS OF IOWA

No. 22-0167
Filed August 17, 2022

**IN RE THE MARRIAGE OF TASHA RENKEN
AND JUSTIN RENKEN**

**Upon the Petition of
TASHA RENKEN,**
     Petitioner-Appellee/Cross-Appellant,

**And Concerning
JUSTIN RENKEN,**
     Respondent-Appellant/Cross-Appellee.
_____

     Appeal from the Iowa District Court for Grundy County, Joel Dalrymple, Judge.

     A father appeals from a dissolution decree granting the child's mother physical care; the mother cross-appeals. **AFFIRMED AS MODIFIED ON BOTH APPEALS AND REMANDED.**

     Jennifer Frese of Kaplan & Frese, LLP, Marshalltown, for appellant/cross-appellee.

     Reyne L. See of Peglow, O'Hare & See, P.L.C., Marshalltown, for appellee/cross-appellant.

     Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

In this dissolution-of-marriage case, both parties direct us to problems they have with the decree. The district court awarded Tasha Renken physical care of their son, J.R.; allocated the parties' marital property; and determined Justin Renken's child-support obligation. Justin was also directed to contribute toward Tasha's attorney fees. Justin contests the physical-care determination and the award of trial attorney fees. We affirm J.R.'s placement in Tasha's physical care because it is in the child's best interests, but expand the father's visitation; we also find no abuse of the district court's discretion by awarding Tasha attorney fees and affirm that award. In Tasha's cross-appeal, she disputes the property division, requests we examine Justin's income, and asks that we revisit the award of a child care variance payment. We find the property division equitable, determine the district court correctly calculated Justin's income, and modify the decree to increase the child care variance. Finally, we also award Tasha appellate attorney fees.

**I. Background Facts and Proceedings.**

To set the stage, Tasha and Justin were married in 2017 and had J.R. in 2020. During the marriage, Justin operated heavy machinery at construction sites—the work was seasonal and coordinated through his union, so he typically worked from mid-April until December and collected unemployment the rest of the year. Because he went where the union directed, he could be gone for weeks at a time. Due to the time demands of Justin's job, shortly after having J.R., Tasha gave up her full-time position as a nurse's aide and took part-time work as a resident aide. This meant a reduction in her hourly wage and fewer hours, but a

more predictable schedule. Tasha was primarily responsible for the child's care, though Justin was involved when he was home.

Not all went well in the marriage after J.R.'s birth. The household family unit included Tasha's teenage son, who lived with Justin and Tasha in Beaman, Iowa. First, in June 2020, Tasha and Justin were in an argument and Justin pushed Tasha. Tasha's son intervened, resulting in a brawl between him and Justin. Tasha called the police to temper the situation but decided not to press charges. Despite having his senior year of high school ahead of him, the teenager moved out of the home. Then, in May of 2021, Tasha and Justin separated after Justin discovered Tasha was sleeping with another man.[1]

After separating, Tasha petitioned for the dissolution of their marriage that same month. Tasha sold her 2016 Chevy Silverado truck—purchased during the marriage—because she could not afford the monthly payment and had expenses to cover. Justin assumed the truck had been repossessed, and Tasha did not correct his misunderstanding.

Now with court proceedings initiated, the two attended mediation on July 8 and a partial settlement agreement was signed by both parties—they agreed to temporarily share care of J.R. with the option, if needed, to "secure assistance from their mediator" to work out any further details. Most of the agreement outlined a

---

[1] The man is still a part of Tasha's life; in her testimony, Tasha described the situation as "friends with benefits" rather than a relationship. There was considerable discussion in front of the district court about the man's criminal history, as well as Justin's and Tasha's. We expressly note Iowa is a no-fault dissolution state, and "[w]e only consider a party's indiscretions if [a] child was harmed by the behavior." *In re Marriage of Johnson*, No. 21-0169, 2021 WL 5105131, at *2 n.2 (Iowa Ct. App. Nov. 3, 2021) (alteration in original) (citation omitted)).

plan for property distribution, including that Tasha could sell the marital home and acreage and keep the proceeds, Justin would receive title to all of the couple's trucks, and each would retain their own bank accounts. Tasha eventually accepted an offer on the home, but when it came time for Justin to sign the paperwork, he told Tasha he would only do so once she produced the title for one of the trucks he possessed. Tasha did not have the title on her but agreed to find it; still Justin demanded some sort of collateral until the title was produced. So, Tasha wrote Justin an $8000 check postdated for September 20 and agreed to produce the title by that date. Tasha secured the title, but exchange plans became challenging as Justin developed COVID-19 soon after. On September 20, Tasha reached out again to exchange the title for the check, but Justin did not respond. Instead, he deposited the check.

Another tension point cropped up because the temporary agreement on joint physical care was premised on Justin living and working around Beaman. But, by the fall of 2021, he was living in Osceola, about 120 miles away, and working for a company based in Polk County. With this new development, Tasha moved to enforce the mediation agreement or determine an appropriate alternative custody plan. In response, Justin asked to adjust the visitation schedule to alternate time weekly rather than every three or four days as their mediation agreement stipulated.[2] After a hearing, a temporary custody order was put in

---

[2] The agreement stated:
> While the home is for sale, the parties shall share time in the home with [J.R]. Week one, Tasha will be in the home 4 overnights and Justin will be in the home 3 overnights, and week two Justin will be in the home 4 overnights and Tasha will be in the home 3 overnights.

place, reenforcing the shared physical care agreement the parties had established and directing the parties to file a partial stipulation of the other terms of the mediation and child-support-guideline worksheets with the court. The district court ordered child support based upon the calculations created by Tasha.

Ultimately, the parties proceeded to trial and looked to the court to settle their disagreements about physical care, visitation, child support, attorney fees, and certain assets including $8000 for the check Justin deposited. Tasha requested physical care while Justin asked for either joint physical care or physical care. His plan for joint physical care was for the child to be with him during the school year while Tasha would have the child during the summer and scheduled breaks in the school year. Tasha pointed to Justin's volatile nature while Justin explained his concerns about Tasha's drinking. It was evident from their testimony that the two struggle to communicate effectively and disagree about basic parenting decisions such as the child's preschool plan, discipline, vaccinations, pacifier use, and toilet training.

To resolve matters, the district court determined that joint physical care was not in the child's best interests and awarded physical care to Tasha. As for the property dispute, because Tasha had retained the proceeds from the sale of her 2016 truck, the district court refused to order Justin to reimburse the $8000 from the check he cashed. To determine child-support obligations, Justin was attributed an annual income of $63,160 and Tasha's yearly salary was set at $34,174; Tasha was to run the numbers through the child support calculator to determine Justin's monthly payments. Finally, the district court also directed Justin to contribute $10,000 toward Tasha's attorney fees, just over half the total amount. On top of

basic child support, Tasha requested a monthly $323.79 upward variance for child care expenses.[3] Justin's response was that because his work is seasonal, he could provide child care for the nineteen weeks in a year he is typically laid off. The district court therefore reduced Tasha's requested amount to account for those nineteen weeks and awarded her an additional $205.48 each month until J.R. starts school.

Justin appealed and Tasha cross-appealed.[4] After submitting her appellate brief, Tasha provided her attorney-fee affidavit; the issue was submitted with her appeal.

## II. Analysis.

In his appeal, Justin argues both that giving physical care to Tasha was not in the child's best interests and the district court abused its discretion by awarding Tasha attorney fees. Tasha cross-appealed, alleging the district court erred by not returning the $8000 to her, in calculating Justin's income, and in reducing the child-care variance. Tasha also requests appellate attorney fees. A dissolution of marriage is heard in equity, so our review is de novo. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021).

A. Custody and Visitation Disputes.

Justin asks that we modify the dissolution decree to grant him physical care of J.R. In the alternative, he asks us to expand his visitation.

---

[3] J.R.'s child care costs $140 each week.

[4] Justin did not submit his proof brief within the time frame established in the briefing deadline. Tasha filed a motion to dismiss, which our supreme court denied before transferring the case to us.

*i. Physical Care.*

When making a physical-care determination, the overarching concern is the child's long-term best interests. *In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974). Iowa Code section 598.41(3) (2021) lays out a non-exhaustive list of factors to consider in that calculus and can also assist in determining the wisdom of a joint physical-care arrangement. *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007). "Physical care issues are not to be resolved based upon perceived fairness to the spouses, but primarily upon what is best for the child." *Id.* at 695. Distance can be a deciding factor in ruling out joint physical care. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 6 (Iowa Ct. App. 2020) (collecting cases); *In re Marriage of Scurr*, No. 11-1905, 2012 WL 2122306, at *1 (Iowa Ct. App. 2020) (determining a forty-five-minute commute between households made joint physical care no longer in the child's best interests). If the court rejects joint physical care in favor of giving one parent physical care, "stability and continuity of caregiving have traditionally been primary factors" in deciding between the parents. *Hansen*, 733 N.W.2d at 696. Leaving flexibility for the specific facts of each case, these factors often "favor a spouse who, prior to divorce, was primarily responsible for physical care." *Id.*

Given the 120-mile distance Justin put between Tasha and himself, a joint physical care arrangement is not feasible. The question then boils down to which parent should be awarded physical care. While both parents can point to the other's faults, it is clear they both care for J.R. and want what is best for the child. Supporting the stability factor, the child attended preschool and had all of his medical care through providers in Tasha's geographical area in the year leading

up to trial. We consider that during the child's life, Justin spent long periods of time away from his role as caretaker due to his job, leaving that work to Tasha. So, in our de novo review, we give weight to the pre-litigation care arrangement, coupled with the current arrangement. As Tasha noted :

> [She], by contrast, works four days per week, from 7:00 a.m. to 1:30 or 2:30 p.m. She no longer has mandated overtime and does not have to work weekends. She reports to the same location in Marshalltown every day. Her work obligations are consistent and predictable, and provide her with the flexibility to meet all of J.R.'s needs.

Likewise, we are concerned about Justin's temper—though he is right when he states in his brief there were "no allegations of aggressive conduct" with *this* child, there were examples of times Justin failed to control his temper in recent months before trial. We agree with the district court that, for the sake of J.R.'s continuity and stability of care, physical care should be with Tasha. *See Scurr*, 2012 WL 2122306, at *3 ("[W]e believe the district court, with its unique ability to assess witness demeanor, was in the best position to determine which . . . parent should serve as physical caretaker.").

We affirm the physical-care determination of the district court.

*ii. Visitation.*

We do not disturb the physical-care arrangement, so Justin asks[5] us to increase his visitation to include:

---

[5] Tasha argues that because Justin did not supply a proposed visitation arrangement, he has not preserved the issue for our review. *See In re Marriage of Maher*, 596 N.W.2d 561, 567 (Iowa 1999) (applying rules of error preservation in a dissolution appeal). Because this is a matter of de novo review and the district court did determine a visitation schedule, we address the merits of Justin's argument. *See In re Marriage of Huston*, 263 N.W.2d 697, 700 (Iowa 1978) (reviewing an appeal from a dissolution action after the appealing party defaulted

> If the child is not in school on Friday [preceding one of Justin's assigned weekends], Justin may extend visitation to Thursday upon release of the child from school or extracurricular activities or 6:00 p.m. to Sunday at 6:00 p.m. If the child is not in school on Monday, Justin may extend visitation to Monday at 6:00 p.m.

In her testimony to the trial court, Tasha agreed to Justin having extra days attached to his weekend visitation as long as J.R. was not in school. And "[g]enerally, liberal visitation is in a child's best interests because it maximizes physical and emotional contact with both parents." *Ites v. Korthals*, No. 07-2172, 2008 WL 2200207, at \*2 (Iowa Ct. App. May 29, 2008); *accord* Iowa Code § 598.41(1)(a). As such, we modify this dissolution decree to include the above language suggested by Justin.

In his reply brief, Justin also requests we change the physical-care arrangement so he has the child the entirety of every spring and Christmas break. Because this is the first time he raises the request, we do not address the issue. *See State v. Olsen*, 794 N.W.2d 285, 287 n.1 (Iowa 2011) (refusing to address an issue when raised for the first time in a reply brief); *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 642 (Iowa 1996) ("Parties cannot assert an issue for the first time in a reply brief. When they do, this court will not consider the issue." (internal citation omitted)). Having said this, we hope Tasha is true to her word that she will not stand in the way of maximum contact between the child and Justin.

---

at the district court); *Swift v. Grabill*, No. 18-1926, 2019 WL 1958121, at \*1 (Iowa Ct. App. May 1, 2019) ("Given our de novo standard of review and because the district court squarely ruled on visitation, we will pass on the question of error preservation and address the merits of [the appellant]'s arguments.").

B. Trial Attorney Fees.

We review an award of attorney fees for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). An appropriate award of attorney fees is largely dependent on the respective parties' ability to pay. *Id.* The award must be fair and reasonable. *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa 1997). We look to these factors and not Justin's argument that an award of attorney fees was improper because Tasha was not the prevailing party. *See In re Marriage of Carter*, No. 19-0136, 2019 WL 6907454, at *1 (Iowa Ct. App. Dec. 18, 2019) ("Because this action involved an original dissolution proceeding rather than a modification, success is not required."). Insofar as Justin requests we decrease the award, we see no abuse of discretion by the district court. It is undisputed that Justin earns almost twice what Tasha does. And the district court directed him to pay $10,000, just over half of the projected total fee. We affirm the district court's award.

C. Tasha's $8000 Check.

On cross-appeal, Tasha argues the district court wrongly allowed Justin to keep the $8000 he obtained by depositing the check she wrote him as collateral for the truck title. She believes the district court wrongly balanced the $8000 against the proceeds she retained from the sale of the 2016 Chevy Silverado she sold one month after she filed for dissolution of the marriage. The proceeds, she argued, were already in her bank account by the time of the mediation that established their property distribution plan, which outlined that each party would keep their own bank account. The parties reached no mediation agreement as to this specific issue. But in text messaging between the parties, Justin described

the agreement between the two as "U wrote a check in exchange for the title by the 20th. Never got the title so i cashed it."

Contrary to Tasha's assertion, allowing Justin to keep the $8000 is not a reward, but a balance. The district court noted that Tasha complied with her part of the bargain by producing the title, so Justin ought to have returned the check. But, with some deception,[6] Tasha sold and retained the funds related to marital property, and "dissipation or waste of marital assets by a spouse prior to the dissolution of marriage may generally be considered in making a property division." *In re Marriage of Burgess*, 568 N.W.2d 827, 828 (Iowa Ct. App. 1997). Tasha testified at trial that, after paying off the loan for the truck, she came away with about $5000 in profit, while Justin believed she received closer to $18,000. Apart from their testimony, there was no evidence supporting either figure. Without a clear number, we cannot find this balance was not equitable and will not disturb the district court's determination.

D. Justin's Income.

True Justin has had years where he worked extra time to support the family, but the district court, noting the sacrifices made by Justin to work more when Tasha switched to part-time status, "refuse[d] to impute any income to Justin commensurate with the income earned when Justin was gone months at a time." Justin's regular work schedule, given his shared schedule with Tasha, should frame the determination of his annual earnings for our purposes. In that end, the

---

[6] Tasha testified "he assumed it got repo'd and I—I just went with it."

trial court found Justin's gross annual income to equal $63,160 (broken down as $52,691 in wages and $10,469 for nineteen weeks of unemployment).

On cross-appeal, Tasha argues the district court wrongly determined Justin's income based on his own testimony about how many weeks he would be working for an hourly wage and how many weeks he would receive unemployment. She maintains the district court ought to have trusted Justin's brother's testimony about his historical work schedule while employed by the same company Justin now works for—the two both do dirt work and make the same hourly wage. She thinks this is a more realistic figure because his brother has worked for the company for years, whereas Justin had been there less than a year when he testified. Rather, his estimated time is based on his work for the union.

Justin's brother, Taylor, testified that his income fluctuates each year based on the weather. He stated his income averages around $60,000 from his seasonal work and an additional $8000 or $10,000 from unemployment. He also testified that he typically works from the beginning of March until December; Justin testified he would be laid off from December to mid-April. Both noted the schedule is variable and depends on the weather that year. And, as Justin points out, because he is a newer employee, he will likely be laid off earlier in the season than his brother and brought back later. And, highlighting the possible fluctuations, Taylor testified that the year before he only made $50,000 as his wage income. Because of the variability inherent in the work, we agree with the district court that about

nineteen weeks of unemployment is reasonable and affirm the calculation of Justin's income.[7]

E. Child-Care Variance.

Tasha's next assertion is that the district court should have granted her the full child-care variance[8] rather than decreasing the amount based on how many weeks Justin would typically be laid off each year. Iowa Court Rule 9.11A allows for a child care variance "[b]ecause the cost of child care is not included in the economic data used to establish the support amounts in the Schedule of Basic Support Obligations." This variance "should be liberally granted." Testimony established that Tasha has to pay $140 a week whether or not J.R. is physically present at the day care in order to hold his spot. And under the terms of the visitation schedule, J.R. will typically be in Tasha's care during the week even when Justin is laid off. While Justin could theoretically provide child care in those times, the 120-mile distance between the two parents makes that an impractical solution. Because Tasha will still require child care during the period of Justin's layoff in order to maintain her employment, we agree the district court should not have decreased the variance based on Justin's work schedule. The district court

---

[7] If in time it can be shown this is not a reasonably accurate reflection of Justin's income, the child support order can be modified. *See* Iowa Code § 598.21C (allowing courts to find "a substantial change of circumstances exists when the court order for child support varies by ten percent or more from the amount which would be due pursuant to the most current child support guidelines").

[8] Iowa Court Rule 9.11A(1) defines "child care expenses" as the "actual, annualized child care expenses the custodial parent pays for the child(ren) in the pending matter that are reasonably necessary to enable the parent to be employed."

already established that Justin's proportional amount of child care expenses prior is $323.79 each month and we modify the dissolution decree to reflect this amount.

F. Appellate Attorney Fees.

Tasha asks for appellate attorney fees—her attorney fee affidavit reflects fees of $10,106. We have considerable discretion to award appellate attorney fees. *See Hensch v. Mysak*, 902 N.W.2d 822, 827 (Iowa Ct. App. 2017). "Factors to consider in determining whether to award appellate attorney fees include 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *In re Marriage of Towne*, 966 N.W.2d 668, 680 (Iowa 2021).

We find that Tasha is entitled to some attorney fees. But, because the attorney fee affidavit is not itemized, we cannot determine if it is reasonable given the issues presented; so, we remand the issue to the district court. *See In re Marriage of Heiar*, 954 N.W.2d 464, 473 (Iowa Ct. App. 2020).

**III. Conclusion.**

For the reasons detailed above, we affirm the district court's decision on physical care but modify the visitation schedule and child-care variance. We wholly affirm the district court's award to Tasha of trial attorney fees, the distribution of the $8000 check, and the determination of Justin's income. We remand to the district court to determine appropriate appellate attorney fees.

**AFFIRMED AS MODIFIED ON BOTH APPEALS AND REMANDED.**